AO 91 (REV.5/85) Criminal Complaint        AUSA Joseph H. Thompson (312) 469-6131

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JOSEPH DICKSON

**CRIMINAL COMPLAINT**

CASE NUMBER: 13 CR 0395

MAGISTRATE JUDGE COX

FILED
5-13-2013
MAY 13 2013
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: On or about October 3, 2012, at Chicago, in the Northern District of Illinois, Eastern Division, JOSEPH DICKSON, defendant herein:

> knowingly and willfully solicited and received a kickback in the amount of approximately $4,200 from Individual A in exchange for the referral of patients to Company A for the furnishing and arranging for the furnishing of services for which payment may be made in whole and in part under a Federal health care program, namely Medicare;

in violation of Title 42, United States Code, Section 1320a-7b(b). I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
Eric Ruhe
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

May 13, 2013   at  1:25 PM
Date

Chicago, Illinois
City and State

Susan E. Cox, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES DISTRICT COURT    )
                                )  ss
NORTHERN DISTRICT OF ILLINOIS   )

## AFFIDAVIT

I, ERIC RUHE, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately December 2009. As part of my duties as FBI Special Agent, I investigate criminal violations relating to federal criminal laws, including various health care fraud prohibitions, mail and wire fraud, and making false statements to defraud an agency of the United States.

2. This affidavit is submitted in support of a criminal complaint alleging that JOSEPH DICKSON has violated Title 42, United States Code, Section 1320a-7b(b). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging DICKSON with soliciting and receiving kickbacks, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, Medicare records, and information provided to me by a confidential informant, other law enforcement agents, and from persons with knowledge regarding relevant facts.

4. My understanding and interpretation of recorded conversations set forth in this affidavit are based on my knowledge of the investigation to date and review of consensually recorded conversations, the content and context of the conversations, prior and subsequent conversation, information provided by a confidential informant, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations. The summaries of conversations do not include all potentially criminal conversations recorded during this investigation, or all statements or topics covered during the course of the recorded conversations. The quoted material contained in the Affidavit is based on summaries of the recorded conversation, not final transcripts, and the times listed for these conversations are approximate.

## I. The Medicare Program

5. The Department of Health and Human Services is an agency of the United States government. HHS's activities, operations, programs, and obligations are funded with federal monies. These programs include the Health Insurance for the Aged and Disabled Program, commonly known as Medicare.

6. The Centers for Medicare and Medicaid Services, a federal agency within the Department of Health and Human Services, administers the Medicare program. The Centers for Medicare and Medicaid Services contracts

with public and private organizations, usually health insurance carriers, to process Medicare claims and perform administrative functions. The Centers for Medicare and Medicaid Services currently contracts with Palmetto GBA to administer and pay Part A claims from the Medicare Trust Fund. The Medicare Trust Fund is a reserve of monies provided by the federal government. Medicare provides free or below-cost health care benefits to certain eligible beneficiaries, primarily persons who are sixty-five years of age and older.

7. Medicare Part A helps pay for medically necessary home health and hospital care. Medicare authorizes payment for home health care only if the care was actually provided and was medically necessary, that is, the services were required because of disease, disability, infirmity, or impairment. Medicare will not pay for services and treatment that were not actually provided or for which that patient did not meet the criteria necessary to justify the claimed service or treatment.

8. Under Home Health Care Medicare Part A, a patient is eligible for coverage if a patient is homebound. In general, a patient is homebound when an illness or injury restricts his ability to leave his place of residence except with the aid of supporting devices or if he has a condition which is such that leaving his home is medically contraindicated.

9. The Medicare Home Health Care Program requires that prior to submitting a claim for reimbursement for a home health service, the claimant-home health care provider must assess the patient, including the severity of the patient's symptoms, and the reimbursement rate to the home health care provider.

10. Medicare typically approves home health care for a 60-day period of time. The 60-day periods are referred to as cycles. An initial cycle of home health care is known as a Start of Care. After the Start of Care cycle, a patient must be "recertified" by a physician to receive additional 60-day cycles of home health care. These new cycle(s) are known as "recertifications."

11. Medicare is a "Federal Health Care Program" as defined in 42 U.S.C. § 1320a-7b(f).

## II. The Federal Anti-Kickback Statute

12. Title 42, United States Code, Section 1320a-7b(b)(1)(a) prohibits, among others, health care providers, including medical doctors, from soliciting or receiving kickbacks in exchange for the referral of Medicare and other federally-insured beneficiaries for covered services. Specifically, the statute provides in pertinent part:

> Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—in return for referring an individual to a person for the furnishing or arranging

4

for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony.

13. Under the federal anti-kickback statute, among other things, it is illegal to knowingly and willfully solicit money or remuneration of any sort from home health care companies in exchange for the referral of a patient for home health care services for which payment may be made under Medicare.

### III. Background of the Investigation

14. According to Illinois Secretary of State records, DICKSON is the president and owner of JD Medical Consultants, Inc., a medical marketing company. He works out of a medical center located in Chicago.

15. During the investigation, DICKSON agreed to refer Medicare beneficiaries to a Chicago-area home health care company in exchange for cash kickback payments from the owner of the company who, unbeknownst to DICKSON, was cooperating with the government (the "CI"). As explained below, during the investigation, DICKSON received cash kickback payments of $4,200 and $1,800 from the CI in exchange for the referral of patients to the CI's home health care company.

16. The CI is the owner of a home health care company located in the Chicago area ("Company A"). The CI has admitted to paying kickbacks to medical doctors in exchange for the referral of Medicare patients to Company A.

The CI is cooperating with the FBI, HHS, and U.S. Attorney's Office in hopes of achieving a more favorable result with respect to potential criminal liability.

17. As part of a related investigation, the CI was identified as an individual involved in paying kickbacks in exchange for the referral of patients to Company A. When initially approached by agents in or about June 2012, the CI admitted that s/he had paid kickbacks in exchange for the referral of Medicare patients to two home health care agencies, Company A and Company B, and agreed to cooperate with the government.

18. During the interview, the CI stated that s/he had been paying cash kickbacks to several medical doctors in exchange for referring Medicare patients to the CI's home health care company since approximately 2008.

19. According to the CI, prior to forming Company A in approximately 2008, the CI worked as a nurse and marketer for another home health care company ("Company B"). While working at Company B, the CI paid kickbacks to doctors and other health care professionals, including DICKSON, for patient referrals to Company B. According to the CI, the patients that DICKSON referred were patients of Physician A. The CI described DICKSON as a "middle man" for Physician A who arranged the referral of patients from Physician A to Company B in exchange for cash kickback payments. According to the CI, s/he

paid DICKSON approximately $15,000 in cash for the referral of approximately 30 patients to Company B from approximately 2006 through 2008.

### IV. DICKSON Agreed to Refer Patients to Company A in Exchange for Cash Kickbacks

20. On June 29, 2012, the CI met with DICKSON at DICKSON's office in Chicago. Prior to the meeting, agents outfitted the CI with hidden audio/video recording devices and activated the devices.

21. As reflected in the audio/video recording, during the meeting:

   a. The CI asked, "how's everything now?" DICKSON responded, "the whole industry is slow basically. I'm sure you're aware of that. It's just slow, slow, slow. . . . doctors are afraid of writing scripts, they're afraid of the FBI, the OIG and everything else out here looking at them. So they are very selective in what they are doing."

   b. The CI asked "do you think you can still help me with the . . . because it's been a long time since I . . . worked with [Company B]." DICKSON responded, "yeah, we can probably use you. . . . We can fill you in, in one of the slots."

   c. The CI asked, "so how many [home health] agencies are you working with right now?" DICKSON replied, "I have three." The CI asked, "is [Company B] still there?" DICKSON stated

7

that it was not. The CI asked if DICKSON gave Company B a lot of patients after they fired the CI. DICKSON replied, "Not after you left, no. After you left, business went down because they couldn't service me like, ah, like you did." The CI stated, "actually they're the boss. I'm, I'm just an employee so they just hand me the money and then [I] give it to you." DICKSON stated, "of course."

d. After DICKSON agreed to begin referring patients to Company A, the CI asked, "and then, what's the deal for . . ." DICKSON replied, "you tell me." The CI said, "I don't know, I mean, you're the boss." DICKSON again stated, "you tell me." The CI said, "It's cause from [Company B] before, it's 5, right?"[1] DICKSON replied, "no." As he did so, DICKSON can be seen on the video holding up six fingers. The CI asked, "it's how much? 600 now?" DICKSON then nodded his head affirmatively. The CI said, "okay, ummm, no discount for old, old friend?" DICKSON then laughed and stated, "I give discounts, but of course you know expenses keep going up too.

---

[1] According to the CI, DICKSON had previously received a $500 kickback for each patient that he referred to Company B.

8

I've gotta keep paying my people. And I have marketers out there I've given four, five bills a piece. You know, that leaves very less for my girls administratively to divide, to make things work." The CI said, "it's 600 now huh. That's for an initial assessment, right? And then how about for the recertification?" DICKSON then held up three fingers. The CI stated, "300?" DICKSON nodded affirmatively. The CI understood DICKSON to mean that he wanted the CI to pay him a $600 kickback for each patient that was certified for Medicare-covered home health care services and an additional $300 kickback for each patient that was later recertified for additional Medicare-covered home health care services after the expiration of the initial 60-day period.

22. On or about July 25, 2012, DICKSON referred a patient, Patient A, to Company A for home health care services by faxing, or causing to be faxed, a patient referral form to Company A. Patient A was certified as eligible for Medicare-covered home health care services beginning on or about August 2, 2012.

23. On or about July 27, 2012, DICKSON referred a patient, Patient B, to Company A for home health care services by faxing, or causing to be faxed, a

9

patient referral form to Company A. According to the CI, Patient B was a patient of another home health care agency. As a result, Company A did not admit Patient B.

24. On or about August 3, 2012, DICKSON referred a patient, Patient C, to Company A for home health care services by faxing, or causing to be faxed, a patient referral form to Company A. Patient C was certified as eligible for Medicare-covered home health care services beginning on or about August 29, 2012. Patient C was later recertified for additional Medicare-covered home health care services beginning on or about October 28, 2012, and December 27, 2012.

25. On or about August 6, 2012, DICKSON referred a patient, Patient D, to Company A for home health care services by faxing, or causing to be faxed, a patient referral form to Company A. Patient D was certified as eligible for Medicare-covered home health care services beginning on or about August 11, 2012.

26. On or about August 17, 2012, DICKSON referred a patient, Patient E, to Company A for home health care services by faxing, or causing to be faxed, a patient referral form to Company A. Patient E was certified as eligible for Medicare-covered home health care services beginning on or about October 20, 2012. Patient E was later recertified for additional Medicare-covered home

health care services beginning on or about December 19, 2012 and February 17, 2013.

27. On or about August 17, 2012, DICKSON referred a patient, Patient F, to Company A for home health care services by faxing, or causing to be faxed, a patient referral form to Company A. Patient F was certified as eligible for Medicare-covered home health care services beginning on or about October 20, 2012. Patient F was later recertified as eligible for additional Medicare-covered home health care services beginning on or about December 19, 2012, and February 17, 2013.

28. On or about August 29, 2012, DICKSON referred a patient, Patient G, to Company A for home health care services by faxing, or causing to be faxed, a patient referral form to Company A. Patient G was certified as eligible for Medicare-covered home health care services beginning on or about September 5, 2012.

29. On or about September 18, 2012, DICKSON referred a patient, Patient H, to Company A for home health care services by faxing, or causing to be faxed, a patient referral form to Company A. According to the CI, Patient H was never certified as eligible for Medicare-covered home health care services by Company A because Patient H was enrolled as a patient at another home health care agency.

30. According to Medicare records and the referral forms, Physician A was the referring physician for Patients A, B, C, D, E, F, and G. Physician B was the referring physician for Patient H.

V. **DICKSON Received a $4,200 Kickback Payment from the CI on October 3, 2012**

31. According to the CI, on September 12 and September 25, 2012, the CI received unrecorded phone calls from DICKSON. During the calls, DICKSON was upset that the CI had not yet paid DICKSON for the patient referrals. The CI arranged to meet with DICKSON on October 3, 2012, to pay DICKSON cash kickbacks in exchange for DICKSON's patient referrals.

32. On October 3, 2012, the CI met with DICKSON at DICKSON's office in Chicago. Prior to the meeting, agents searched the CI's person and vehicle for cash or contraband. Agents found that the CI had $39 in his/her pocket. Agents then outfitted the CI with hidden audio/video recording devices and activated the devices. Agents also provided the CI with $4,200 in cash for use in paying a kickback to DICKSON.

33. As reflected in the audio/video recording, during the meeting, the CI handed DICKSON a list of patients that DICKSON had referred to Company A. The CI explained that there were seven patients that Company A had admitted for home health care services. The CI stated, "we agree for 600, right?" After DICKSON responded affirmatively, the CI asked, "so I owe you four, two?"

DICKSON replied, "yeah." The CI then pulled out a large amount of cash and stated, "I'm gonna count it, Joe. . . . I want to make sure that you get the money right." The CI then counted out $4,200. When he had finished, DICKSON said, "very good. Thank you." The CI said, "that's for the seven patients that I owe you, 600 per patient." DICKSON replied, "that's correct." The CI then handed the cash to DICKSON. The CI stated, "I forgot to bring the envelope because I just went to the bank." DICKSON responded, "That's alright. I'll take it." The CI said, "so hopefully I'm gonna get more business from you." DICKSON replied, "without a doubt."

34. Following the meeting, the CI met agents at a predetermined meeting area. Agents recovered the audio/video recording devices from the CI. Agents then searched the CI and the CI's vehicle for money and contraband, finding that the CI had $39 in his/her pocket.

## VI. DICKSON Received an $1,800 Kickback Payment from the CI on December 4, 2012

35. On or about October 17, 2012, DICKSON referred a patient, Patient I, to Company A for home health care services by faxing, or causing to be faxed, a patient referral form to Company A.[2] Patient I was certified as eligible for Medicare-covered home health care services beginning on or about October 26,

---

[2] According to Medicare records and the referral forms, Physician B was the referring physician for Patient I.

13

2012. Patient I was later certified as eligible for additional Medicare-covered home health care services beginning on or about December 25, 2012, and February 23, 2013.

36. On December 4, 2012, the CI met with DICKSON at DICKSON's office in Chicago. Prior to the meeting, agents searched the CI's person and vehicle for cash or contraband. Agents found that the CI had $5 in his/her pocket. Agents then outfitted the CI with hidden audio/video recording devices and activated the devices. Agents also provided the CI with $1,800 in cash for use in paying a kickback to DICKSON.

37. As reflected in the audio/video recording, during the meeting, after entering DICKSON's office, the CI asked, "do you want me to close the door?" DICKSON replied, "yeah, please." The CI then stated, I got the two recerts for [Patient E] and [Patient F]. And then the new patient that we admit, [Patient H] and [Patient I]. So it's four." DICKSON replied, "four." The CI stated, "So it's 1,800 for . . . I'm just gonna make sure I count it just to make sure we're on the same page." The CI then counted out 1,800 and handed the cash to DICKSON. DICKSON took the money and said "thank you very much, sir."

38. Following the meeting, the CI met agents at a predetermined meeting area. Agents recovered the audio/video recording devices from the CI.

Agents then searched the CI and the CI's vehicle for money and contraband, finding that the CI had $5 in his/her pocket.

### VII. Medicare Payments for DICKSON's Patients

39. According to Medicare records, Company A submitted a claim for services rendered to Patient A and subsequently received approximately $2,527 from Medicare for services rendered to Patient A between August 2 and September 30, 2012.

40. According to Medicare records, Company A submitted three claims for services rendered to Patient C: (a) Company A received approximately $1,107 from Medicare for home health services provided to Patient C between August 29 and October 27, 2012; (b) Company A received approximately $1,661 from Medicare for services provided to Patient C between October 28 and December 26, 2012; and (c) Company A received approximately $940 from Medicare for services provided to Patient C beginning between December 27, 2012 and February 22, 2013.

41. According to Medicare records, Company A submitted a claim for services rendered to Patient D and subsequently received approximately $2,608 from Medicare for services rendered to Patient D between August 11 and October 9, 2012.

42. According to Medicare records, Company A submitted three claims for services rendered to Patient E: (a) Company A received approximately $1,368 from Medicare for home health services provided to Patient E between October 20 and December 28, 2012; (b) Company A received approximately $949 from Medicare for services provided to Patient E between December 19, 2012 and February 16, 2013; and (c) Company A received approximately $949 from Medicare for services provided to Patient E beginning between February 17 and April 16, 2013.

43. According to Medicare records, Company A submitted three claims for services rendered to Patient F: (a) Company A received approximately $1,311 from Medicare for home health services provided to Patient F between October 20 and December 18, 2012; (b) Company A received approximately $949 from Medicare for services provided to Patient F between December 19, 2012 and February 16, 2013; and (c) Company A received approximately $949 from Medicare for services provided to Patient F beginning between February 17 and April 17, 2013.

44. According to Medicare records, Company A submitted a claim for services rendered to Patient G and subsequently received approximately $236 from Medicare for services rendered to Patient G between September 5 and October 10, 2012

45. According to Medicare records, Company A submitted three claims for services rendered to Patient I: (a) Company A received approximately $2,708 from Medicare for home health services provided to Patient I between October 26 and December 24, 2012; (b) Company A received approximately $1,281 from Medicare for services provided to Patient I between December 25, 2012 and February 22, 2013; and (c) Company A received approximately $1,053 from Medicare for services provided to Patient I beginning between February 23 and April 23, 2013.

## VIII. DICKSON Admitted to Agents that he had Received Kickbacks from the CI and that he Knew it was Illegal to Receive Kickbacks

46. On January 9, 2013, agents interviewed DICKSON at his home in Lansing, Illinois. According to agents, during the interview, DICKSON admitted that he had received kickbacks from the CI in exchange for referring Medicare patients to Company A. DICKSON stated that he had referred three or four patients to Company A in exchange for cash payments from the CI. DICKSON said that he knew that it was illegal to pay or receive kickbacks in exchange for patient referrals. He explained that he became aware that it was illegal to pay or receive kickbacks after he read articles during the summer of 2011 about people being arrested in Detroit for paying/receiving kickbacks for patient referrals. DICKSON also stated that he had read that the FBI and Health and

Human Services Officer of Inspector General were going to be coming to Chicago soon to investigate kickback payments for patient referrals.

## IX. Conclusion

47. Based on the foregoing, I believe there is probable cause that on or about October 3, 2012, JOSEPH DICKSON solicited and received a $4,200 kickback in exchange for the referral of Medicare beneficiaries to a home health care agency, in violation Title 42, United States Code, Section 1320a-7b(b).

FURTHER AFFIANT SAYETH NOT.

_____
ERIC RUHE
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on May 13, 2013

_____
SUSAN E. COX
United States Magistrate Judge